John Hamilton Leib Jr. v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-02-096-CR

Â Â Â Â Â JOHN HAMILTON LEIB, JR.,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â v.

Â Â Â Â Â THE STATE OF TEXAS,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 

From the 87th District Court
Freestone County, Texas
Trial Court # 99-076-CR
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â Pursuant to a plea agreement, the court placed John Hamilton Leib, Jr. on deferred
adjudication community supervision for the offense of indecency with a child. On February 25,
2002, the court adjudicated Leibâs guilt and sentenced him to fifteen yearsâ imprisonment. Leib
filed a general notice of appeal.
Â Â Â Â Â Â To properly invoke the jurisdiction of this Court over an appeal from a negotiated guilty plea,
an appellant must file a notice of appeal which complies with Rule of Appellate Procedure
25.2(b)(3). White v. State, 61 S.W.3d 424, 429 (Tex. Crim. App. 2001); Tex. R. App. P.
25.2(b)(3). This rule applies with equal force to âan appeal, made either before or after an
adjudication of guilt, by a defendant placed on deferred adjudication who challenges an issue
relating to his conviction.â Woods v. State, 68 S.W.3d 667, 669 (Tex. Crim. App. 2002).
Â Â Â Â Â Â Leibâs general notice of appeal does not comply with Rule 25.2(b)(3). Accordingly, we
dismiss his appeal for want of jurisdiction.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â PER CURIAM
Before Chief Justice Davis,
Â Â Â Â Â Â Justice Vance, and
Â Â Â Â Â Â Justice Gray
Appeal dismissed for want of jurisdiction
Opinion delivered and filed October 23, 2002
Do not publish
[CR25]



ace:none'>Anthony
Graves was convicted of capital murder and sentenced to death in 1994 for the
capital offense of murdering six people in the same transaction.  The
procedural history of GravesÂ conviction, post-conviction appeals and writ
petitions is presented in our previous opinions addressing GravesÂ application
for certificate of appealability. This court originally granted COA only on
GravesÂ Brady claim that the state failed to disclose to Graves that key
prosecution witness and GravesÂ co-defendant Robert Earl Carter informed the
district attorney that Graves was not involved in the charged crime on the day
before he testified to the contrary at GravesÂ trial.Â  Graves v.
Cockrell, 351 F.3d 143 (5th Cir. 2003) (ÂGraves IÂ). On rehearing,
this court modified its order and also granted COA on GravesÂ claim that the
stateÂs failure to disclose CarterÂs alleged statement implicating his wife in
the crimes violated GravesÂ rights under Brady. Â Graves v. Cockrell,
351 F.3d 156 (5th Cir. 2003)Â (ÂGraves IIÂ). Â The case was
remanded to the district court

for an evidentiary hearing to determine:
(1) the substance of the alleged statement described above, along with CarterÂs
statement allegedly exonerating Graves; (2) whether Graves was aware of these
statements or exercised due diligence to discover these statements; (3) whether
the stateÂs failure to disclose these statements was material to GravesÂ
defense under Brady; and (4) for a determination of whether Graves is entitled
to relief on these claims.

Graves II, 351 F.3d at 159.Â  COA was denied on
all other claims.

Â 

On remand,
an evidentiary hearing was held before Magistrate Judge Froeschner who, after
reviewing briefly the facts of the crime, made the following factual findings
in his report and recommendation.

Â 

CarterÂs
wife, Cookie, was also indicted for the offense of capital murder. Â Attorneys
Calvin Garvie and Lydia Clay-Jackson, who defended Graves at trial, believed
this indictment to be a sham based on false evidence presented to the grand
jury and obtained only in order to pressure Carter to testify against Graves. Â Evidentiary Hearing Transcript (ÂEHTÂ) at 129, 168. Â Nevertheless, Burleson County
District Attorney Charles Sebesta, who prosecuted Graves, insisted that the
State believed from early on that Cookie participated in the killings and that
all evidence pointed to the involvement of three people. Â Id. at 57, 98. Â Indeed,
the StateÂs theory from the beginning of the trial was that at least three
people had acted together in the murders. Â Id. at 174.[1]Â  Texas Ranger Coffman
testified at trial that his investigation showed Âat least three and possibly
fourÂ perpetrators were in the Davis home when the murders occurred. Â Trial
Transcript (ÂTTÂ), vol. 38 at 3728.

Â 

[1] This
theory appears to be based on the number of victims, six, and the number of
murder weapons, three (a gun, knife and hammer), not on any specific physical
evidence.

Â 

Prior to
the beginning of GravesÂ trial, the District AttorneyÂs office had been in
negotiations with Carter and his appellate attorney for CarterÂs testimony
against Graves. Â According to Sebesta, no final agreement on the terms had been
reached prior to CarterÂs arrival in Brazoria County for GravesÂ trial,
although any final plan was to involve the use of a polygraph exam before he
testified. Â Id. at 51. Â The early discussions also involved CarterÂs condition
that the State would not ask him questions about his wifeÂs role in the
murders. Â Id. at 54.

Â 

Sebesta met
with Carter in the early evening of October 21, 1994.[2] Â According to Sebesta, Carter
almost immediately claimed, ÂI did it all myself, Mr. Sebesta. I did it all
myself.ÂÂ  Id. at 60. Â When Sebesta stated that he knew that was not true
because of the number of weapons used, Carter quickly changed his story and
claimed that he committed the murders with Graves and a third man called ÂRed.Â
Â Id. at 61, 94, 95. Â Carter had earlier implicated a person named ÂRedÂ during
the murder investigation, and the State believed that Theresa Carter may have
been known by that nickname. Â PetitionerÂs Ex. 9 at 24. Â When Sebesta proposed
that ÂRedÂ was actually Cookie, Carter denied it and agreed to take a polygraph
exam. Â EHT at 95.

Â 

[2] This was the evening of the second day of the
guilt/innocence phase of the trial.

Â 

Since the
polygraph examiner had been out sick that day, he was called to come in to
administer the exam. Â Id. at 96. Â The report states that Carter signed a
polygraph release statement, had the exam explained to him, and then changed
his story once more before the exam was given by stating that he had killed the
 Davis family with Graves but without ÂRed.ÂÂ  PetitionerÂs Ex. 9 at tab 4.
Â The interviewer then posed the following questions to Carter: Â (1) Â[W]as your
wife, Theresa, with you [at the time of the murders]?Â and (2) Â[W]hen you
refer to ÂRedÂ in your statement, are you talking about your wife, Theresa?ÂÂ  Id. Â Carter answered ÂnoÂ to both questions. Â The polygraph examiner concluded that Carter
was not being truthful in either response. Â Id. Â When the polygraph results
were explained to him, Carter once more changed his story. Â He now admitted
that Cookie was involved in the murders with himself and Graves. Â He also
stated that he had invented the character ÂRedÂ but later admitted that Cookie
was sometimes called ÂRed.ÂÂ  Id. Â When Sebesta asked him if Theresa had
used the hammer in the murders, Carter answered Âyes.ÂÂ  EHT at 96.

Â 

In addition
to the tentative deal to forego questions about Cookie in exchange for
testifying against Graves, the State had also been working on a broader
agreement that would allow Carter to accept a life sentence rather than death
if his case were reversed in appeal. Â This required Carter to testify against
both Graves and Cookie. Â Id. at 67. Â By the time the October 21 meeting
concluded, he had tentatively assented to do so, though no final agreement was
reached. Â Id. at 62, 103, 105. Â The next morning, however, Carter refused to
testify against Cookie and reverted to the initial terms already worked out
with the State. Â Both Carter and Sebesta then accepted the tentative agreement
as the final deal for his testimony.

Â 

At the
evidentiary hearing, Garvie denied that he knew before, or at any time during,
trial that Carter had told Sebesta he killed the Davis family himself. Â Sebesta
testified that he mentioned the statement to Garvie on the morning Carter
testified. Â Id. at 149. Â The Court accepts GarvieÂs version of this event based
on his credibility as a witness and as being consistent with his vigorous
defense of Graves at trial. Â Sebesta did reveal part of the polygraph results
on the morning of October 22 when he told the trial judge: Â Âlast night at 8:30
Mr. Carter took a polygraph[,] and the basic question involved his wife,
Theresa. Â It shows deception on that polygraph examination. Â But, obviously, we
canÂt go into polygraphs here, but I think counsel is certainly entitled to
know that.ÂÂ  TT, vol. 35 at 3360. Â Garvie asked no questions about what
the polygraph involved. Â GarvieÂs co-counsel testified that it did not occur to
the defense to inquire into SebestaÂs statement because they believed the
indictment against Cookie was unfounded. Â EHT at 134.Â  Nor did it fit the
defenseÂs theory of the case. Â According to Ms. Clay-Jackson, the defense
thought that at least two people were involved in the killings but that Cookie
was not one of them. Â Id. at 122. Â The State then called Carter to the stand
and revealed to the jury that he was testifying in exchange for an agreement
that questions would not be asked about his wife. Â TT, vol. 35 at 3429.

Â 

GravesÂ habeas attorneys appear to have
first learned of CarterÂs statement, ÂI did it all myself,Â in 1998. Â On June
19, 1998, GravesÂ former attorney took a deposition from Carter in which he
claimed to have acted alone. Â Ex parte Graves, No. 40,812-01 at 97 ff. Â That
statement was excluded from the record by the state court as inherently
unreliable because GravesÂ attorney failed to notify the State, as required by
law, in order to allow cross-examination. Â Carter again recanted his trial
testimony in a May 18, 2000, deposition attended by both Sebesta and GravesÂ current counsel. Â Sebesta later appeared on the Geraldo Rivera show Deadly
Justice on September 3, 2000, and repeated CarterÂs self-confession. Â Sebesta
stated: Âyes, and at that point he [Carter] did tell us, ÂOh, I did it myself. Â I
did it.ÂÂ  He did tell us that.ÂÂ  PetitionerÂs Ex. 1.

Â 

The magistrate judge found that
Sebesta did not reveal CarterÂs statement that he committed the murders alone
to the defense and that because GravesÂ attorneys had no way of knowing about
the statement, they had no reason to exercise due diligence to discover it.

Â

Graves
bases his Brady claims on two suppressed statements the state admits
Carter made on the evening before Carter testified at GravesÂ trialÂfirst, that
Carter committed the crimes alone, and second, that CarterÂs wife Cookie was an
active participant in the murders.

Â 

No one disputes
that Carter was the stateÂs star witness. Â Graves made no self-incriminating
statements to the police before his trial. Â He testified before the grand jury
denying all involvement and explaining his whereabouts on the night of the
murders. Â The only potentially incriminating statements allegedly made by Graves were heard over the jailhouse intercom system. Â The persons reporting these
statements were effectively cross-examined on the reliability of the intercom
system, their ability to recognize GravesÂ voice since his cell could not be
seen from their listening post, and their failure to make contemporaneous
reports of the comments.

Â 

The only
physical evidence tied to Graves that was marginally linked to the crimes was a
switchblade knife brought forward by GravesÂ former boss that was identical to
one that he had given to Graves as a gift. Â The medical examiner testified that
the knife wounds on the victims were consistent with that knife or a
knife with a similar blade. Â GravesÂ medical expert testified that a wide range
of knives with similar dimensions to the switchblade were also consistent with
the victimsÂ wounds including holes in skull caps of some of the victims. Â None
of the murder weapons were recovered. Â Thus, it is obvious from the record that
the state relied on CarterÂs testimony to achieve GravesÂ conviction. Â It is in
this context that the materiality of the suppressed statements must be
examined.

Â 

a. The
suppressed statement by Carter that he committed the crimes alone.

Â 

The
district court found that Graves was not aware of CarterÂs statement that he
committed the crime by himself but found that the statement was not material.[4]Â  Our original assessment
of this statement was that it Âwas extremely favorable to Graves and would have
provided powerful ammunition for counsel to use in cross-examining Carter.ÂÂ 
Graves I, 351 F.3d at 155. Â Although we did not have a completely
accurate version of the events surrounding the statement at the time of our
original opinion, under the facts as found by the district court on remand we
reach the same conclusion.

Â 

[4] District Attorney Sebesta contradicted GravesÂ counsel
and testified at the habeas hearing that he told GravesÂ defense counsel Garvie
of this statement outside the courtroom the morning after Carter made the
statement. Â The district court did not find Sebesta credible on this point.

Â 

CarterÂs
statement that he acted alone in committing the murders is particularly
significant because it was the first statement Carter made that implicated
himself without also implicating Graves. Â The only other statement Carter made
pre-trial exculpating Graves was before the grand jury. Â In that statement
Carter claimed that neither he nor Graves was involved in the murders. Â At
trial the state recognized that its case depended on the credibility of Carter
and the prosecutor emphasized CarterÂs consistency in his various statements in
naming Graves as an accomplice.Â  In CarterÂs grand jury testimony Carter
testified that he only gave GravesÂ name to investigators because he was
coerced.[5]Â  The
prosecutor explained CarterÂs grand jury testimony by pointing out that CarterÂs
testimony, that neither he nor Graves was involved, followed threats by Graves.[6] Â CarterÂs suppressed
mid-trial statement exculpating Graves was not coerced and would have undercut
the stateÂs argument that Carter did not implicate Graves before the grand jury
because Graves threatened him. Â The stateÂs case depended on the jury accepting
CarterÂs testimony. Â Given the number of inconsistent statements Carter had
given, the state faced a difficult job of persuading the jury that Carter was a
credible witness, even without the suppressed statement. Â Had the defense been
able to cross-examine Carter on the suppressed statement, this may well have
swayed one or more jurors to reject CarterÂs trial version of the events.

Â 

[5]Â Before the grand jury, Carter testified as follows:

I couldnÂt
harm anybody, but during interrogation, between seven and eight hours or so, I
was told that they got enough evidence on me to give me the death penalty. Â I
know I havenÂt done anything wrong.Â  I know I wasnÂt in Somerville like they
say I was. Â They say they know that I didnÂt do it, but I know who did it and they
wanted me to give a name so I tried to tell them that I don't know anybody.

And by
being pressured, being hurt, confused and didnÂt know what to think, I said
Anthony Graves off the top of my head.

Â 

[6] After eliciting testimony from Carter that Graves had
threatened him physically and verbally while they were housed in the Burleson
County Jail, the following exchange took place between Sebesta and Carter as
Carter testified at GravesÂ trial:

Sebesta: Â What did you do when you
went to the Burleson County grand jury?

Carter: Â Lied.

Sebesta: Â Why did you lie?

Carter: Â Because I was afraid.

Sebesta: Â How did you go about lying
to them?

Carter: Â Saying that I made up the
whole story, that it didnÂt take place.

Â 

Perhaps
even more egregious than District Attorney SebestaÂs failure to disclose CarterÂs
most recent statement is his deliberate trial tactic of eliciting testimony
from Carter and the chief investigating officer, Ranger Coffman, that the D.A.
knew was false and designed affirmatively to lead the jury to believe that
Carter made no additional statement tending to exculpate Graves. Â District
Attorney Sebesta asked Carter to confirm that, with the exception of his grand
jury testimony where he denied everything, he had always implicated Graves as being with him in committing the murders. Â Carter answered in the affirmative. Â Sebesta
also asked Ranger Coffman, after Carter testified, to confirm that all of
CarterÂs statements except the grand jury testimony implicated Graves. Sebesta also confirmed through Ranger Coffman that he understood his obligation to
bring to the prosecutor's attention any evidence favorable to the defense.
Although there is no factual finding regarding whether Ranger Coffman knew of
Carter's statement that he committed the crimes alone, Sebesta clearly knew of
the statement and used Ranger Coffman as well as Carter to present a picture of
Carter's consistency in naming Graves that Sebesta clearly knew was false.

Â 

b. The suppressed statement by Carter
that Cookie was an active participant in the murders.

Â 

The state
stipulated that Carter told Sebesta, ÂYes, Cookie was there; yes Cookie had the
hammer.ÂÂ  This statement was also made the night before Carter testified
in GravesÂ trial. Â Sebesta did not inform GravesÂ counsel of this statement. Â He
did disclose to the court and counsel that Carter had failed a polygraph
regarding CookieÂs involvement.[7] Â The
district court found that after hearing about the polygraph, Graves did not
exercise due diligence to discover the substance of the statement. Â The
district court also found that the statement was not exculpatory because it did
not exculpate Graves. Â Rather it was consistent with the stateÂs three person
theory, that the crime was committed by Carter, Cookie and Graves. Â We disagree
on all points.

Â 

[7] Sebesta
made the following statement:Â  ÂThere is something I need to put on the record
from a[sic] exculpatory standpoint. Â It cannot be used, but last night at 8:30
Mr. Carter took a polygraph and the basic question involved his wife, Theresa. Â It
shows deception on that polygraph examination. Â But, obviously, we canÂt go
into polygraphs here, but I think Counsel is certainly entitled to know that.Â

Â 

Due
Diligence?

Â 

The
district court found that SebestaÂs in-court statement Âwas not so vague in light
of the surrounding circumstances that they should not have inquired about it
further.ÂÂ  However, SebestaÂs statement did not reveal or even imply that
Carter gave a statement affirmatively naming Cookie as an active participant in
the murders. Â The defense had specifically requested any information related to
any party, other than Graves and Carter, who the state alleged was involved in
the crime. Â They had no evidence that Cookie was involved in the crime and
viewed her indictment as a tool to get Carter to testify. Â This assumption was
confirmed by SebestaÂs discovery response. Â SebestaÂs response to the defenseÂs
discovery request was that Âthere were some names that were givenÂ to the
State, but that Â[t]heyÂre not necessarily parties to the crime but they are
people who may haveÂmay possibly have some information on those.Â
Â SebestaÂs questioning of Carter at GravesÂ trial about CookieÂs
involvement also reinforced defense counselÂs belief that she was involved, if
at all, after the crimes were committed. Â In SebestaÂs questioning of Carter,
Sebesta asked Carter to confirm their agreement that he would not ask any
questions about his wife and to confirm that he had Ânot asked [him] any
question about what she may or may not know about it.Â Â When the defense
cross-examined Carter, they asked about CookieÂs whereabouts and who possessed
the hammer. Â CarterÂs testimony was obviously different than the statement he
gave Sebesta the previous night that Cookie was there and Cookie had the
hammer.

Â 

We disagree
with the district courtÂs conclusion that the defense did not exercise due
diligence to discover the statement regarding CookieÂs involvement in the
crimes. GravesÂ counsel had specifically requested the information disclosed in
the statement. We view SebestaÂs statement regarding the polygraph, his
discovery responses and questioning of Carter as misleading and a deliberate
attempt to avoid disclosure of evidence of CookieÂs direct involvement. Â At a
minimum, SebestaÂs minimal disclosure was insufficient to put the defense on
notice to inquire further, particularly in light of the stateÂs discovery
disclosure.

Â 

Exculpatory?

Â 

Graves next
challenges the district courtÂs conclusion that the statement regarding CookieÂs
involvement is not exculpatory because the statement implicated Graves as well.[ ]Â The district court
found that the statement is not exculpatory because it implicated Graves based on the governmentÂs three person theory. Â It also found that the statement
would have contradicted the testimony of one of GravesÂ witnesses, Tametra Ray,
who testified that Cookie was home at the time of the murders. Â Again, we
disagree.

Â 

The
statement regarding CookieÂs direct involvement in the crime is exculpatory for
several reasons. Â First, each partyÂs theory about how many people were
actively involved in the crime is just a theory based on the number of people
killed and the number of weapons used. Â The defense had submitted that two
people were probably involved and had specifically requested any information
related to any party, other than Graves and Carter, who the state alleged was
involved in the crime. Â Although Cookie had been indicted, the defense viewed
the indictment as a tool to pressure Carter into testifying. Â As we noted in
our prior opinion, Âif Graves had been furnished with CarterÂs statement, it
could have provided him with an argument that those two persons were Carter and
his wife rather than Carter and Graves.ÂÂ  Graves II, 351 F.3d at
159. Â Also, CarterÂs statement, placing Cookie directly at the scene and
actively involved in the murders, puts his deal with the state to testify only
on the condition that he not be questioned about CookieÂs involvement in a
different light. Â It provides a stronger argument to Graves that Carter was
lying about GravesÂ involvement to save Cookie.

Â 

The
district court did not reach the issue of materiality of the statement. Â That
issue will be discussed in the following section regarding the effect of the
two statements considered together.

Â 

c. The
statements considered together?

Â 

The sole
remaining issue under GravesÂ Brady claim is whether, considered
together, the two statementsÂCarterÂs claim that he did it himself and CarterÂs
statement directly implicating his wife Cookie in the murdersÂare material. Â We
conclude that they are. Â If both statements had been timely furnished to
Graves, he could have persuasively argued that (1) the murders were committed
by Carter alone or by Carter and Cookie; and (2) CarterÂs plan from the
beginning was to exonerate Cookie, but a story that he acted alone was not
believable, so he implicated Graves so the prosecution would accept his story
and decline to prosecute Cookie.

Â 

The state
argues that the combined statements are not material because they are
inconsistent and could have been damaging to Graves if the jury believed that
the most credible account of the murders involved three killers, Carter, Cookie
and Graves. Â The problem with the stateÂs argument is that it analyzes the
significance of the suppressed evidence against a backdrop of how the defense
presented its case at trial without the suppressed statements. Â If the two
statements had been revealed, the defenseÂs approach could have been much
different (as set forth above) and probably highly effective.

. . .

Because the
state suppressed two statements of Carter, its most important witness that were
inconsistent with CarterÂs trial testimony, and then presented false,
misleading testimony at trial that was inconsistent with the suppressed facts,
we have no trouble concluding that the suppressed statements are material. Â Carter
made several inconsistent statements throughout the investigation and pre-trial
period. Â In some he denied all involvement, in some he implicated himself and
Graves, and then, just before he testified against Graves, he gave the
statements at issue in this appeal accepting full responsibility as the sole
murderer and another statement placing his wife Cookie as an active participant
in the murders. Â If the defense had known about the statement placing Cookie at
the scene and given CarterÂs continuing condition that he would only testify if
he were not asked about Cookie's involvement, the defense could have explained
every statement implicating Graves as a means of protecting Cookie. Â As
indicated above, these statements are particularly important in this case
because GravesÂ conviction rests almost entirely on CarterÂs testimony and
there is no direct evidence linking him with Carter or with the murder scene
other than CarterÂs testimony. Â In addition, CarterÂs statement that he
committed the crimes alone is important as the only statement he made
exculpating Graves while implicating himself. The combination of these facts
leads us to conclude Âthat the favorable evidence could reasonably be taken to
put the whole case in such a different light as to undermine confidence in the
verdict.Â Â Kyles, 514 U.S. at 435, 115 S.Ct. 1555.Â  Stated
differently, disclosure of the statements Âwould have resulted in a markedly
weaker case for the prosecution and a markedly stronger one for the defense.ÂÂ 
 Id. at 441, 115 S.Ct. 1555.

Â 

For the
foregoing reasons, the judgment of the District Court is reversed and the case
is remanded with instructions to grant the writ of habeas corpus unless the
state proceeds to retry petitioner within a reasonable time.

Â 

Graves, 442 F.3d at 336-45 (footnote 8 omitted).

Â 

Extension of Kennedy an Open Question

Â 

Masonheimer held that the Oregon v. Kennedy standard barred retrial Âunder
the unique circumstances of that caseÂ because the State had intentionally
failed to disclose exculpatory evidence with the specific intent to avoid the
possibility of an acquittal.Â  Masonheimer, 220 S.W.3d at 507.Â  The Masonheimer
court reasoned that Âin a case like this, a defendant suffers the same harm as
when the State intentionally ÂgoadsÂ or provokes the defendant into moving for
a mistrial.Â Â Id.Â  Masonheimer did not involve a reversal on
appeal, and its ruling was limited Âto retrial after a defense-requested
mistrial.ÂÂ  Masonheimer, 220 S.W.3d at 508 n.19.Â  ÂThis rule arguably
would not apply to a retrial after a reversal of a defendantÂs conviction on
appeal because, in such a situation, the defendantÂs valued right to have
guilt-innocence determined by the first trier of fact has not been compromised.ÂÂ 
Id.Â  (emphasis added).

In Bauder,
the Court of Criminal Appeals interpreted the Double Jeopardy provision of the
Texas Constitution more expansively to cover ÂrecklessÂ conduct, holding that
retrial would also be barred Âwhen the prosecutor was aware but consciously
disregarded the risk that an objectionable event for which he was responsible
would require a mistrial at the defendantÂs request.ÂÂ  Bauder v. State, 921
S.W.2d 696, 699 (Tex. Crim. App. 1996).[2]Â  In Ex
parte Peterson, the Court of Criminal Appeals reaffirmed and clarified the
standard enunciated in Bauder.Â  Ex parte Peterson, 117 S.W.3d 804
(Tex. Crim. App. 2003).

Â Â Â Â Â Â Â Â Â Â Â  However,
the Court of Criminal Appeals recently overruled Bauder and Peterson
in Ex parte Lewis, 219 S.W.3d 335 (Tex. Crim. App. 2007).Â  The court
held that Âthe proper rule under the Texas Constitution is the rule articulated
by the United States Supreme Court in Oregon v. Kennedy,Â i.e.,
whether the prosecutor intended to provoke the defendant into moving for a
mistrial.Â  Id. at 337; see id. at 371.Â  Lewis also
reaffirmed the holdings in Ex parte Davis and Ex parte Mitchell.Â 
 Id. at 371.Â  In Davis the court held that retrial was not
jeopardy-barred under the U.S. Constitution when the conviction had been vacated
because of, in part, prosecutorial misconduct.Â  Ex parte Davis, 957
S.W.2d 9, 11-12 (Tex. Crim. App. 1997).Â  In Mitchell the court held that
retrial was not jeopardy-barred under the U.S. Constitution when the conviction
was reversed because of a Brady violation.[3]
Â Ex parte Mitchell, 977 S.W.2d 575, 578-80 (Tex. Crim. App. 1998).

Â Â Â Â Â Â Â Â Â Â Â  I believe that Masonheimer and
other authorities strongly suggest that the Double Jeopardy Clause bars retrial
when the State commits a Brady violation with the intent to avoid the
possibility of an acquittal and the conviction has been reversed on appeal or
collateral habeas corpus relief has been granted.Â  See Masonheimer, 220
S.W.3d at 506-08.Â  Also, the federal double jeopardy analyses in Davis
and Mitchell have been criticized:

The analytical double jeopardy standard adopted by
the Supreme Court in Oregon v. Kennedy does not appear to include any
consideration of whether the criminal defendantÂs ultimately successful motion
for mistrial was granted during trial or on appeal. Â Therefore, this Court
respectfully rejects that portion of
the Texas Court of Criminal AppealsÂ analysis suggesting a constitutional distinction
between cases in which a mistrial has been granted during trial and those in
which a new trial is granted on appeal based on the same allegations of
prosecutorial misconduct.Â  See Ex parte Jack Warren Davis, 957 S.W.2d at
13 (ÂApplicant has not directed us to any cases, however, where the Supreme
Court has explicitly extended Oregon v. Kennedy to apply to instances
where verdicts of guilty have been reversed on appeal due to prosecutorial
misconduct, and therefore holding retrials as jeopardy barred.Â). Â Given the
plain language of the Supreme CourtÂs opinion in Oregon v. Kennedy, this
Court concludes the distinction offered by the Texas Court of Criminal Appeals
is inconsistent with clearly established federal law.

Â 

Davis v. Quarterman, 2007 U.S. Dist. LEXIS 64793, at 53 n.31 (W.D. Tex. Jan. 22, 2007); see Lewis, 219 S.W.3d at 382-83 & nn.37-38 (Price, J.,
dissenting) (ÂThus, to the extent these cases [Davis and Mitchell]
are logically unfaithful to Bauder, they are equally unfaithful to the Oregon
v. Kennedy standard.Â  It seems to me that if any of our precedent deserves
closer scrutiny, it would be Davis and Mitchell, not Bauder.Â);
see also Albernaz v. United States, 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275
(1981) (Âthe decisional law in the area [of
Double Jeopardy] is a veritable Sargasso Sea which could not fail to challenge
the most intrepid judicial navigatorÂ).

Near the same vein, Judge Meyers noted in Davis that Kennedy did not decide that double jeopardy would not bar retrial
if an appellate court determined that the trial court erroneously denied a
defense motion for mistrial based on prosecutorial misconduct because the Kennedy
courtÂs assumption that the appellate determination would present no bar is
dicta.Â  Davis, 957 S.W.2d at 17 (Meyers, J., concurring) (citing Kennedy,
456 U.S. at 676, 102 S.Ct. at 2089-90).Â  And the Supreme CourtÂs statement in Lockhart
v. Nelson, 488 U.S. 33, 34 n.2, 109 S.Ct. 285, 288
n.2, 102 L.Ed.2d 265Â (1988), and its curious citation to KennedyÂÂThere is no indication that the prosecutor knew of the
pardon and was attempting to deceive the court.Â  We therefore have no occasion
to consider what the result would be if the case were otherwise.Â  Cf. Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).ÂÂhas led at
least one court to note that the Supreme Court has left open the question
whether appellate reversal for prosecutorial misconduct involving intentional
deception may be sufficiently similar to Kennedy for retrial to be
jeopardy-barred.Â  Jacob v. Clarke, 52 F.3d 178, 181 (8th Cir.
1995) (ÂBut the Court's latest signal is decidedly more
ambiguous. In Lockhart, an appellate reversal case decided in the
prosecutionÂs favor, the Court introduced its double jeopardy analysis by
stating that the record revealed no prosecutorial misconduct.Â  Such a pointed
caveat suggests that this remains an open issue.Â).

In conclusion, Kennedy
neither decided the issue before us nor foreclosed it.

Double Jeopardy Revisited

A defendant has a Âvalued right to have his trial
completed by a particular tribunal.ÂÂ  Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Â Â[H]is
valued right to have the trial concluded by a particular tribunal is sometimes
subordinate to the public interest in affording the prosecutor one full and
fair opportunity to present his evidence to an impartial jury.ÂÂ  Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717
(1978).

Â Masonheimer recognizes that under the
circumstance of the StateÂs belief that undisclosed evidence may make Âthe
difference between a conviction and an acquittal[, the defendantÂs] valued
right to have his guilt-innocence determined by the jury in the first trial
and, Âperhaps, end the dispute then and there with an acquittalÂ was something
of a Âhollow shellÂ even though this may not have become apparent until the
middle of the second trial.ÂÂ  Masonheimer, 220 S.W.3d at 508 n.18
(citing Oregon v. Kennedy, 456 U.S. at 673, 102 S.Ct. at 2088).Â  The
State had its Âone full and fair opportunity,Â but GravesÂs Âvalued rightÂ to
have his guilt-innocence determined by the first jury likewise was a Âhollow
shellÂ because, as the Fifth Circuit repeatedly emphasized (see n.4, infra),
his trial was so tainted by the Brady violation and prosecutorial misconduct.
Â Cf. Robinson v. Wade, 686 F.2d 298, 308 n.20 (5th Cir. 1982) (ÂMoreover, the defendantÂs valued right to go to a
particular tribunal, involved in cases where the proceedings are not completed,
is equally implicated where a motion for mistrial is denied, but the subsequent
jury verdict is set aside for prosecutorial overreaching.Â) (citation omitted).

In such Âa trial tainted by prejudicial . . . prosecutorial
error,Â Â[t]he important consideration, for purposes of the Double Jeopardy
Clause, is that the defendant retain primary control over the course to be
followed in the event of such error.ÂÂ  United States v. Dinitz,
424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976); see Lewis,
219 S.W.3d at 379 (Price, J., dissenting) (ÂAnd, at some point, prosecutorial
misconduct may become so egregious that it cannot fairly be said that the
defendant has retained primary control over the decision whether to proceed to
verdict or abort the proceedings.Â).Â  Unlike a defendant who becomes aware of a
Brady violation or prosecutorial misconduct during trial and can
therefore either move for a mistrial or proceed to verdict, Graves did not
learn of the exculpatory statements and prosecutorial misconduct for several
years.Â  Graves, therefore, not only had his valued right turned into a hollow
shell, but the concealment of the Brady evidence and the corresponding prosecutorial
misconduct deprived him of Âprimary control over the course to be followed in
the event of suchÂ misconduct.[4]Â  Had
 Graves learned of the Brady evidence during trial and chosen to move
for and received a mistrial, under Masonheimer, plainly retrial would be
jeopardy-barred.Â  And the notion that Graves can be retried because the
prosecutor succeeded in hiding his actions during trial precariously jumbles double
jeopardy principles.Â  Cf. Burks v. United States, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978) (Âit should make no difference that the reviewing
court, rather than the trial court, determined the evidence to be insufficient.
. . .Â  To hold otherwise would create a purely arbitrary distinction between
those in petitionerÂs position and others who would enjoy the benefit of a
correct decision by the District Court.Â).

I believe, therefore, that an extension of Kennedy
to the circumstances of this case is consistent with and reinforces the Supreme
CourtÂs double jeopardy jurisprudence.Â  The Fifth Circuit has voiced this view:

Nor is the rationale of Burks
inconsistent with application of the Âprosecutorial overreachingÂ exception to
bar retrial where the overreaching caused a tainted verdict to be set aside,
rather than a tainted proceeding to be aborted.Â  BurksÂ holding, resting
on a perceived dichotomy between reversals for trial error and reversals for
evidentiary insufficiency, indicated that, as the former hold no implication
for the guilt or innocence of the defendant, they would raise no bar to further
prosecution.Â  That distinction does not necessarily hold true where trial error
is attributable to intentional prosecutorial overreaching.Â  The extreme tactics
which constitute prosecutorial overreaching
offend the double jeopardy clause at least in part because they unfairly
deprive the defendant of possible acquittal, by heightening, in a manner
condemned by law, the juryÂs perception of the defendantÂs guilt.Â  Whether the
tactic condemned is successful in its objective of securing a mistrial, or
unsuccessful, but causes the return of a verdict of conviction, would seem to
be of little significance in development of a law of preclusion designed to
protect this interest.

Â 

Robinson,
686 F.2d at 307-08 (citations and footnote omitted). Â And Judge Price, joined
by Judges Meyers and Holcomb, noted in Lewis:

The State is entitled to one full and fair
opportunity to present its evidence to an impartial jury. . . .Â  When the
prosecutor intentionally commits misconduct he knows will seriously compromise
the fairness of the trial, he has arguably squandered his one full and fair
opportunity to present his case, so that the StateÂs interest can no longer be
said to outweigh the defendantÂsÂeven if he did not harbor a specific intent to
provoke a mistrial.Â  If his intention was to inject manifest unfairness into
the proceeding, and he was consciously indifferent with respect to whether this
intentional misconduct illegitimately increased his chances of gaining a
conviction or provoked the defendant into asking for a mistrial, the argument
is practically as compelling that he has forfeited his one full and fair
opportunity to present his case as when it was his specific intent to provoke a
mistrial.Â  Either way, a reasonable argument can be made that the prosecutor
has manipulated the defendantÂs choice to such an extent that it is no longer
primarily the defendantÂs, and the State can no longer show that its interest
outweighs the defendantÂs in the constitutional balance.

. . .

Ordinarily, double jeopardy entitles the defendant
to proceed to verdict with the first tribunal selected.Â  Manifest necessity or
the defendantÂs own consent may suffice to defeat his constitutional interest,
but not otherwise.Â  This means that sometimes the defendant must experience the
anxiety, expense, and delay of a second trial even when his first trial was
rendered unfair for reasons unattributable to him.Â  But he should not
necessarily have to suffer that consequence when the retrial was attributable
to deliberate misconduct on the part of the prosecutor.Â  When that misconduct
so compromised the fairness of trial as to render mistrial inevitable, and the
prosecutor was at least consciously indifferent to that result, the State may
reasonably be said to have abused its one full and fair opportunity to present
its evidence to an impartial tribunal, and it can no longer carry its burden to
demonstrate that its interest in the jeopardy balance outweighs the defendantÂs,
even when it was the defendant who requested a mistrial. Â Thus, jeopardy
principles are vindicated.Â  It is true that the fairness that due process and
due course of law guarantee may also be vindicated and that the prosecutor may
feel he is being made to pay a heavy price for his misconduct.Â  But these
consequences are incidental to, and do not by any means displace, the jeopardy
analysis.

Â 

Lewis, 219 S.W.3d at 380-82 (Price, J., dissenting).

Â 

Dicta from the Second CircuitÂs
decision in United States v. Wallach, 979 F.2d 912 (2d Cir. 1992), suggests
that the Double Jeopardy Clause might protect a defendant against retrial if
the prosecutorial misconduct was undertaken with the intent of preventing an
acquittal the prosecutor reasonably believed, at that time, was likely absent
such misconduct.Â  Id. at 916.Â  WallachÂs proposed extension of Kennedy
should be applied to this case because the Brady violation and
prosecutorial misconduct were of such a nature that they could not have been
discovered by the defense until after trial, and the actions were undertaken to
avoid a likely acquittal.

Â Â Â Â Â Â Â Â Â Â Â  In Wallach, the Second Circuit analyzed possible
extensions of KennedyÂs holding. Â The government argued that Kennedy
should be limited to the context of a criminal trial that ends with a
defendantÂs successful motion for a mistrial. Â Like Wallach, Graves did not move for a
mistrial, much less obtain one, because he did not know about the alleged
misconduct until after trial. Â Wallach argued for an extension of Kennedy
that would eliminate the requirement of a mistrial because he believed that the
Supreme Court also intended Kennedy to bar a second prosecution when the
prosecutor engages in serious misconduct with the intention of preventing an
acquittal. Â Id. at 915.Â  The Second Circuit suggested that some
extension of Kennedy might be warranted, explaining:

Since Kennedy bars a retrial on
jeopardy grounds where the prosecutor engages in misconduct for the purpose of
goading the defendant into making a successful mistrial motion that denies the
defendant the opportunity to win an acquittal, the Supreme Court might think
that the Double Jeopardy Clause protects a defendant from retrial in some other
circumstances where prosecutorial misconduct is undertaken with
the intention of denying the defendant an opportunity to win an acquittal.

Â 

Id. at 916. 

The Wallach court went on to
suggest that a narrower extension than the one sought by Wallach might be
appropriate. Â The Wallach court believed that in Kennedy, the
Supreme Court was attempting to delineate the distinction between prosecutorial
misconduct that merely results in a mistrial (which does not bar retrial), and
misconduct that is undertaken for the specific purpose of provoking a mistrial.
Â According to the Wallach court, Kennedy bars retrial only in the
latter case. Â Id. Â But, the Wallach court stated:

If any extension of Kennedy
beyond the mistrial context is warranted, it would be a bar to retrial only
where the misconduct of the prosecutor is undertaken, not simply to prevent an
acquittal, but to prevent an acquittal that the prosecutor believed at the time
was likely to occur in the absence of his misconduct.[[5]] Â If jeopardy bars a retrial where a
prosecutor commits an act of misconduct with the intention of provoking a
mistrial motion by the defendant, there is a plausible argument that the
same result should obtain where he does so with the intent to avoid an
acquittal he then believes is likely. Â The prosecutor who acts with the
intention of goading the defendant into making a mistrial motion presumably
does so because he believes that completion of the trial will likely result in
an acquittal. Â That aspect of the Kennedy rationale suggests precluding
retrial where a prosecutor apprehends an acquittal and, instead of provoking a
mistrial, avoids the acquittal by an act of deliberate misconduct. Â Indeed, if Kennedy
is not extended to this limited degree, a prosecutor apprehending an acquittal
encounters the jeopardy bar to retrial when he engages in misconduct of
sufficient visibility to precipitate a mistrial motion, but not when he fends
off the anticipated acquittal by misconduct of which the defendant is unaware
until after the verdict. Â There is no justification for that distinction.

Â 

Id.
(emphases added).

Â 

WallachÂs
dicta has received support from Judge Posner:

There is an argument for a further
extension of Kennedy that would bring [defendantÂs] case within the
range of the double jeopardy clause. Â Confined to cases in which the defendant
is goaded into moving for a mistrial, whether the motion is granted or denied, Kennedy
would leave a prosecutor with an unimpaired incentive to commit an error that
would not be discovered until after the trial and hence could not provide the
basis for a motion for a mistrial, yet would as effectively stave off an
acquittal and thus preserve the possibility of a retrial. Â Suborning perjury
would be a good example.[[6]]
Â It can be argued that if the prosecutor commits a covert error for the same
purpose that he might have committed an open error calculated to evoke a motion
for a mistrial (before Kennedy made this tactic unprofitable)Ânamely, to
prevent an acquittal and so preserve the possibility of retrying the defendant
even if the error is sure to be discovered and result in a reversal of the
conviction either on direct appeal or on collateral attackÂthe double jeopardy
clause should protect the defendant against being retried. Â 

Â 

United States v. Catton, 130 F.3d 805, 807 (7th Cir. 1997).

Â Â Â Â Â Â Â Â Â Â Â  I would hold that the
Fifth AmendmentÂs Double Jeopardy Clause bars the State from retrying Graves.Â  Because the majority does not, I respectfully dissent.

Â 

BILL VANCE

Justice

Â 

Dissenting Opinion
delivered and filed November 5, 2008

Publish









[1] The majority opinionÂs view that
no record evidence supports GravesÂs arguments is incorrect.Â  In addition to
our proper reliance on the legal and factual issues decided by the Fifth
Circuit because they are res judicata (and thus cannot be relitigated by the
State), the record excerpts from GravesÂs first trial (which we have made a
part of the record in this appeal at the request of both Graves and the State)
are properly before us; I believe that our review of the trial courtÂs ruling
on the double jeopardy claim in GravesÂs habeas petition is de novo because
that issue is a question of law.Â  The resolution of the ultimate questions
turns on an application of legal standards absent any credibility questions,
which is the case given the federal courtÂs resolution of the relevant facts
underlying GravesÂs petitionÂs double-jeopardy claim. Â See State v. Webb, 244 S.W.3d 543, 547 (Tex. App.ÂHouston [1st Dist.] 2007, no pet.); see
also State v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006) (ÂThe
appellate court then reviews the trial courtÂs legal ruling de novo unless the
supported-by-the-record implied fact findings are also dispositive of the legal
ruling.Â) (cited in Masonheimer, 220 S.W.3d at 506 n.14); Oles v.
State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999) (ÂHowever, the instant
case presents us with a question of law based on undisputed facts, thus we
apply de novo review.Â).





[2] The majority opinion
acknowledges, (ante at 7, n.4), that approximately ten states,
interpreting their own state constitutions, bar retrials after a conviction has
been reversed because of intentional prosecutorial misconduct.

Â 





[3] Davis and Mitchell also both held
that, under the now-overruled Bauder standard, retrial was not
jeopardy-barred under the Texas Constitution.Â  Davis, 957 S.W.2d at
12-15; Mitchell, 977 S.W.2d at 580-81.





[4] This was recognized by the Fifth Circuit:

At trial the state recognized that its
case depended on the credibility of Carter and the prosecutor emphasized
CarterÂs consistency in his various statements in naming Graves as an
accomplice. . . .Â  Had the defense been able to cross-examine Carter on the
suppressed statement, this may well have swayed one or more jurors to reject
CarterÂs trial version of the events.

Graves, 442
F.3d at 341.

If both statements had been timely
furnished to Graves, he could have persuasively argued that (1) the murders
were committed by Carter alone or by Carter and Cookie; and (2) CarterÂs plan
from the beginning was to exonerate Cookie, but a story that he acted alone was
not believable, so he implicated Graves so the prosecution would accept his
story and decline to prosecute Cookie. . . .Â  If the two statements had been
revealed, the defenseÂs approach could have been much different (as set forth
above) and probably highly effective. . . .Â  If the defense had known about the
statement placing Cookie at the scene and given CarterÂs continuing condition
that he would only testify if he were not asked about Cookie's involvement, the
defense could have explained every statement implicating Graves as a means of
protecting Cookie.

Id. at 343-44.





[5] Based on the Fifth CircuitÂs
opinion, there can be no question that the only reasonable inference on the
prosecutorÂs intent in concealing CarterÂs exculpatory statements and then in
also knowingly eliciting testimony that he knew was false and misleading
because of the concealed exculpatory statements made to him the night before is
that the prosecutor was acting with the intent to avoid the possibility of a
likely acquittal.Â  See Kennedy, 456 U.S. at 675, 102 S.Ct. at 2089
(ÂInferring the existence or nonexistence of intent from objective facts and
circumstances is a familiar process in our criminal justice system.Â); Masonheimer,
220 S.W.3d atÂ  507 & n.18 (Âwe are constrained to decide that the extensive
portions of the record set out in this opinion support a finding that
appelleeÂs mistrial motions were necessitated primarily by the StateÂs
ÂintentionalÂ failure to disclose exculpatory evidence that was available prior
to appelleeÂs first trial with the specific intent to avoid the possibility of
an acquittal. . . .Â  The trial court could have also reasonably found that the
State believed that the undisclosed evidence may have made the difference
between a conviction and an acquittal.Â); id. at 510 (Meyers, J.,
concurring) (ÂRather than trying to determine the subjective intent of the
prosecutor, we can objectively look at the actions of the State to determine if
the actions were intentional.Â).





[6] In CarterÂs testimony during GravesÂs trial, Sebesta
questioned Carter as follows:

Q.Â  With the exception of where you have totally
denied everything, have you always implicated Graves as being with you?

A.Â  Yes.

. . .

Q.Â  With the exception of the time you went to the
grand jury and denied any involvement, all the different stories that you told
have all involved Anthony Graves, have they not?

A.Â  They have.

Vol. 35, p. 3443.